*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2011-363

JANUARY TERM, 2012

| | |
|---|---|
| In re A.M., G.M., J.M. & M.M., Juveniles | } APPEALED FROM: |
| | } |
| | } Superior Court, Windsor Unit, |
| | } Family Division |
| | } |
| | } DOCKET NO. 28/29/30/31-3-09 Wrjv |

Trial Judge: Walter M. Morris, Jr.

In the above-entitled cause, the Clerk will enter:

Mother and father appeal from the trial court's order terminating their parental rights to A.M., G.M., J.M., and M.M. Mother argues that the court erred in evaluating the mother-child bond. Father asserts that the court erred in concluding that his ability to parent the children had stagnated and that termination of his rights was in the children's best interests. We affirm.

Mother and father are the biological parents of A.M., born in 2001; G.M., born in 2003; M.M., born in 2004; and J.M., born in 2006. The family lived in Tennessee before moving to Vermont, and there were a number of interventions with the family by the Tennessee Department of Children's Services. The Vermont Department for Children and Families (DCF) became involved with the family in November 2008 after the children's maternal grandmother reported concerns about the children's well-being. Between November 2008 and March 2009, DCF provided assistance and services for the family. In March 2009, DCF filed a petition to have the children adjudicated as children in need of care or supervision (CHINS). The court issued a conditional custody order that allowed the children to continue living with parents subject to a number of terms. At the time, the family was homeless and living in a shelter. Parents were required, among other things, to engage with service providers to secure and maintain adequate housing; to arrange for A.M. and G.M. to attend school on a daily basis; and to engage in a variety of services addressed to individual and family needs.

In April 2009, the parties stipulated and the court found that the children were CHINS. The parties agreed at the disposition hearing that the children would remain in the conditional custody of parents. In the months following this order, mother was asked to leave the homeless shelter due to interpersonal conflicts with other families living at the shelter. Father became the children's primary caregiver, although they had regular contact with mother. These contacts with mother became a matter of concern to DCF. Mother was living in a motel with an unknown man, and the motel was used by the Department of Corrections to house offenders, including sex offenders. Father allowed the children to visit mother there and stay overnight. On another occasion, mother was living with a friend, and she assaulted this friend in the presence of father and the children. In November 2009, after finding that the children were not properly supervised, the court transferred custody of the children to DCF. Parents were directed, among other things, to establish safe housing; explore part-time employment; and to meet the children's emotional needs through pre- and post-visit coaching. In October 2010, DCF moved to

terminate parents' residual parental rights. Following a four-day hearing in April 2011, the court granted the request in a September 2011 order.

The court made numerous findings, including the following. Parents' relationship had historically been problematic. Both parents had significant long-term health problems, physical and mental, which did not appear to be getting better. Physically, they both experienced chronic pain and attendant issues concerning pain management. Father was addicted to prescription pain medication at one point. He continued to take a variety of medications to manage his pain and anxiety. Father also had Chiari malformation—a chronic genetic disorder that resulted in migraine headaches, gait and balance issues, and, occasionally, seizures. Mother suffered from borderline personality disorder, a chronic mental illness. Mother also had unspecified anxiety disorder; recurrent major depressive disorder; and pain disorder, associated with psychological factors and a general medical condition. Mother's mental health issues rendered her unable to properly moderate her behaviors and communications, to communicate and problem solve with others, to avoid unreasonable conflict, and thus, to provide stable and consistent guidance and nurture for the children. Mother also lacked insight into the consequences of her mental illness, and she required significant assistance in planning and attending to activities and exercising independent judgment. The court found that the course of treatment for mother's mental illness was long and the prognosis mixed. Father's mental impairment was much less significant than mother's. The court found that father nonetheless needed to address issues of depression and his emotions in dealing with others, including service providers and foster parents.

The court observed that while parents had undertaken to comply with most of the case plan requirements, they had also delayed case plan progress by refusing to comply with some case plan responsibilities or by initially refusing and later changing their minds. While father had over time displayed greater ability and willingness to comply with case plan responsibilities, the court found that his efforts were, in key aspects, compromised by mother's conduct. Mother initially refused to participate in substance abuse or mental health evaluations. She declined to provide releases, and then signed releases "under duress," delaying the process of evaluation and impeding the exchange of information. Mother also impeded an expert's psychological assessment of the family. The court found that, in key instances, services providers had engaged in greater effort than parents to address the responsibilities that had been identified for them in the case plan. On the whole, it concluded that while parents completed certain responsibilities of the case plan, they failed to substantially and reasonably comply with the central expectations of that plan consistent with the children's interests.

The court found that parents regularly visited the children, although they were often late for the visits, causing the younger children anxiety. These visits occurred in the presence of a coach from Easter Seals Family Time or some other supervisor. Father attended significantly more pre-visit meetings than mother, although mother showed some improvement after February 2011. The court found that father was a more stable and consistent presence for the children during the visits. Mother was largely detached and was less engaged with the children. She struggled to engage emotionally in Family Time, and even with coaching or redirection, it was difficult for her to participate. She frequently took breaks from the visits, leaving the room to talk on the phone or to smoke cigarettes. She did not display flexibility consistent with the children's interests and would keep working on a project even though the children had tired of it and wanted to move on. At times, she would persistently engage with one of the children to the exclusion of the others to the point where the child was frustrated and upset. She occasionally made unhelpful comments to the children and appeared unaware of the impact these statements had on the children. Father tried to help mother, but he then became diverted from his own attentions to the children. Given the children's individual emotional needs, the court found that

2

the impact of mother's detachment or needs diverted the efforts of both parents to provide a positive parenting interaction. The court also found that both parents demonstrated little patience in dealing with G.M., who has special needs, during visitation.

The Family Time coach submitted a report in February 2011. She noted that chronic problems had persisted in parents' level of engagement in the Family Time program and the quality of their visits, which warranted reevaluation of the family's participation in the program. The court credited the coach's assessment that mother had failed to make any significant improvement in the quality of her engagement with the children during visits. The court also found that telephone contact with the children had been causing the children anxiety and distress. The calls were supposed to be of limited duration, but mother showed consistent difficulty in reasonably disengaging from the calls, despite the fact that the children did not want to remain on the telephone for extended periods. The calls also at times resulted in father making threats and using inappropriate language to the foster parents.

As to other case plan requirements, the court found that parents' housing problems continued after the children came into DCF custody. Parents did not follow advice in securing Section 8 vouchers. At one point they were living in a motel and then in a tent. Parents eventually secured housing in October 2010. The court found that neither parent was employed, nor had father made any sustained effort to secure employment, which was a requirement of the case plan. Parents received food stamps of $340 per month. At one point, mother's benefits were reduced because she engaged in impropriety related to the food stamps.

The court found that parents accepted no responsibility for the circumstances that resulted in the children being placed in DCF custody. Parents believed that they were the victims of an unreasonable system that brought about the separation, which clearly impeded their efforts to secure reunification of their family. Parents had also threatened those workers and providers with whom they disagreed. Father's communications and conduct in particular served to place others in reasonable concern for their safety. His conduct was the direct cause of the loss of the resource of Easter Seals Family Time Coaching to facilitate parent-child contact and the process of family reunification. The court found that parents made minimal progress in assuming increased responsibility for personal progress and rehabilitation and, of greater significance, in actually parenting the children. There plainly had been no substantial progress on either parent's part in meeting and addressing the children's varied and significant needs and best interests to the point that they might resume custody and parenting of them within any reasonable period of time. Even father acknowledged that if reunification were to occur, it would be a slow process.

The court explained that the children had been placed in foster care after coming into DCF custody in November 2009. Both A.M. and G.M. were in the same foster home, and the foster parents provided the children with an emotionally and physically beneficial environment. G.M. has special needs, which presented special parenting challenges. He was born prematurely, he failed to thrive as an infant, and he experienced developmental delays. He also has LEOPARD syndrome, a multisystem condition that can have an impact upon development and organ functioning. He presents himself as younger than his age. G.M. needs intense, focused, and consistent direction, attention, and affection. The court found that both G.M. and A.M. had made substantial progress in their foster home, both personally and academically. The foster parents were prepared to adopt A.M. but not G.M., although they were committed to providing foster care and maintaining a long-term relationship with him in a transition to a permanent placement. M.M. and J.M. were living together in a different foster home, where they had also made significant progress. The foster parents provided a loving, stable and beneficial home for the children, and they were committed to adopting M.M. and J.M.

3

Marilyn Gabriel performed a psychological assessment of the family at DCF's request, and her report was entered into evidence. The court found that Ms. Gabriel testified as a highly qualified expert. She opined that each of the children displayed emotional and psychological needs consistent with parental neglect. Ms. Gabriel observed that the children displayed a loving bond with parents, but she described this as a "traumatic bond" displayed by children in circumstances such as those here in which they display love and affection for parents at their own expense.

Based on these and numerous other findings, the court concluded that, despite making some effort, parents' relationship with the children had clearly stagnated, especially on mother's part. It found that mother's lack of engagement significantly hindered father's efforts to build a relationship and exercise parenting responsibilities. Based on the length of time in which the children had been in foster care and parents' lack of progress in assuming greater parental responsibilities and care consistent with the children's needs, the court found no reasonable likelihood that mother or father could resume parenting within any reasonable period of time as measured from the child's perspective. The court recognized that parents loved their children but emphasized that the key issue was what parenting environment was in the children's best interests. The court found that the children needed permanence, a family, and a loving environment. It stated that parents continued to face significant barriers in their ability to care for the children. They lacked any insight into their shortcomings and the circumstances that brought the children into DCF custody. Mother was essentially disengaged from meaningful relationships with the children. Despite father's efforts, the court found that he was clearly unable to move forward in effective parenting relationship and that he remained committed to mother. For these and other reasons, the court concluded that termination of parents' rights was in the children's best interests. This appeal by parents followed.

Mother argues that the court misapprehended the evidence in assessing the mother-child bond. She complains that there was evidence to show that the parent-child bond was strong but the court nonetheless portrayed her as playing a negative role during visits and telephone contact. She challenges the court's finding that she was often disengaged during visits. Mother also argues that there was no evidence to show that she had difficulty ending phone calls with the children, causing them distress. She suggests that there is confusion as to how the court actually viewed her role in the children's lives, which she argues leaves considerable doubt as to the basis for the court's decision.

When the termination of residual parental rights is sought, the court must find that there has been a substantial change in material circumstances and that termination of parental rights is in a child's best interests. In re B.W., 162 Vt. 287, 291 (1994). "A change in circumstances is most often found when the parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time." In re H.A., 153 Vt. 504, 515 (1990). To determine a child's best interests, the court must consider four statutory factors. See 33 V.S.A. § 5540. The most important factor is the likelihood that the natural parent will be able to resume his or her parental duties within a reasonable period of time. In re B.M., 165 Vt. 331, 336 (1996). As long as the court applied the proper standard, we will not disturb its findings on appeal unless they are clearly erroneous; we will affirm its conclusions if they are supported by the findings. In re G.S., 153 Vt. 651, 652 (1990) (mem.).

The court did not err in assessing mother's role in the children's lives, and its findings on this issue are supported by the evidence. The court recognized that mother had ongoing and consistent contact with the children, that she loved the children, and that she wanted to have a

continuing relationship with them. Nonetheless, it found that the parent-child bond was an unhealthy one. Ms. Gabriel testified to this effect, and the court found her credible. The court also credited testimony that mother was often disengaged during parent-child visits. The court recognized that mother was capable of interacting in a positive way with the children during visitation, but it found her ability to do so was inconsistent and counterbalanced by other interactions or detachment that negatively affected the children. The court's finding that mother's telephone contact causes the children "frustration, discomfort, and unease" is also supported by the record. The children's foster mothers so testified. All of mother's arguments essentially turn on the court's assessment of the credibility of witnesses and the weight of the evidence, matters reserved exclusively for the trial court. In re A.F., 160 Vt. 175, 178 (1993); see also In re S.B., 174 Vt. 427, 429 (2002) (mem.) ("Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating mother's parental rights"). As set forth above, the court concluded that notwithstanding mother's love for the children, the statutory best-interest factors showed that termination was in the children's best interests. See In re M.B., 162 Vt. 229, 238 (1994) (recognizing that "[p]ublic policy . . . does not dictate that the parent-child bond be maintained regardless of the cost to the child"). It did not err in so concluding.

We turn to father's arguments. Father first asserts that the evidence and the court's findings do not support its conclusion that he had stagnated in his ability to parent the children. In support of his argument, father points to progress that he made in meeting the requirements of the case plan.

We find no error. As we have recognized, "the mere fact that a parent has shown some progress in some aspects of his or her life does not preclude a finding of changed circumstances warranting modification of a previous disposition order." In re A.F., 160 Vt. 175, 181 (1993). The court recognized that father had made some progress. Nonetheless, it concluded that he had made no meaningful progress in assuming greater parenting responsibilities throughout the lengthy period that the children had been in custody. Father still needed to work on his mental health and anger issues, he continued to lack any insight into the circumstances that brought the children into custody, he failed to make any effort to secure employment, he had not fully engaged with vocational rehabilitation to secure his finances and develop money management skills to maintain financial stability, and he had not developed a plan to become self-sufficient in his ability to meet the children's physical, emotional, and developmental needs. Additionally, the court found that mother was clearly unable to move forward in an effective parenting relationship and that father was committed to mother. The court acted within its discretion in concluding that father had stagnated in his ability to care for the children.

Father also argues that the court erred in concluding that termination of his rights was in the children's best interests. He states that he continued to have positive daily interaction with the children either in person or by telephone and continued to play a constructive role and provide emotional support to the children. Father asserts that he is now ready to resume parenting.

The trial court concluded otherwise, and its decision is supported by the record. As noted above, the children had been in foster care for almost eighteen months at the time of the hearing, waiting for parents to make progress in their caretaking ability. This was a substantial period of time in the children's lives and in their personal development. During this time, father had not made progress in his ability to assume greater parenting responsibilities. Indeed, even father acknowledged that any reunification with the children would be a slow process. As the court found, moreover, mother's lack of engagement significantly hindered father's efforts to build

5

relationships and exercise parental responsibilities. Father's commitment to mother, including his commitment to living with mother, detracted from his ability to meet the children's needs. Father further refused to acknowledge any responsibility for the parental shortcomings that led to the children being taken into DCF custody. The court reasonably concluded that the children needed stability and permanence now and that they could not afford to wait for father to overcome his significant personal barriers and gain the skills necessary to parent them. While father argues that the evidence supports his position, it is for the trial court, not this Court, to weigh the evidence. A discretionary ruling of the trial court "will not be set aside simply because a different result might have been supportable, or because another court might have reached a different conclusion." In re L.R.R., 143 Vt. 560, 562 (1983). The court did not abuse its discretion in concluding that the statutory best-interest factors supported termination of father's rights.

Affirmed.

BY THE COURT:

_____
John A. Dooley, Associate Justice

_____
Brian L. Burgess, Associate Justice

_____
Beth Robinson, Associate Justice

6